J-S26010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LATHAN NICHELSON, | |
| Appellant | No. 1061 EDA 2017 |

Appeal from the Judgment of Sentence Entered February 28, 2017
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0006845-2015

BEFORE:  BENDER, P.J.E., BOWES, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED JULY 16, 2018**

Appellant, Lathan Nichelson, appeals from the judgment of sentence of five days' to six months' incarceration, and a $25 fine, imposed after he was convicted of driving under the influence of alcohol (hereinafter "DUI"), 75 Pa.C.S. § 3802(a)(1), and restriction on alcoholic beverages (hereinafter "open containers"), 75 Pa.C.S. § 3809(a). After careful review, we affirm.

The trial court set forth a detailed summary of the facts and procedural history of Appellant's case, as follows:

> [Appellant] was charged with DUI as a misdemeanor of the first degree and summary [open containers] stemming from an arrest on June 7, 2015. The Commonwealth alleged that [Appellant] had driven to a parking lot under the influence where he was found by police with vomit outside the car and an open bottle of beer in the center console area. The bills were amended

---

[*] Former Justice specially assigned to the Superior Court.

to add an additional DUI charge. On February 27, 2017, a jury trial began with Officer [Dustin] Wittmer, an eight[-]year veteran of the Abington Township Police Department. N.T. Trial[,] 2/27/17[,] [at] 112. Officer Wittmer had received training on standard field sobriety testing, the effects of alcohol on the body, and identifying signs of impairment. *Id.* at 113-14. Officer Wittmer had come into contact with between 300-500 individuals under the effects of alcohol and hundreds of people under the influence of marijuana. *Id.* at 114. On June 7, 2015, at approximately 2:54 AM, Officer Wittmer was on patrol, when his tour of duty took him to 1352 Easton Road which was the location of Tony's Pizza, which sold bottles and cans of beer, and The Elbow Room, a bar. *Id.* at 114-15. There was a shared parking lot at that location. *Id.* at 116. The Elbow Room was open seven days a week, and Tony's Pizza was open every weekend and most days of the week, but was occasionally closed Monday and Tuesday. *Id.* The parking lot is a traffic way open to the public that had two exits and entrances. *Id.* at 114-17. On this night, there was only one vehicle in the parking lot, a Ford F-150 with the headlights on and engine running. *Id.* at 117. The [o]fficer saw large amounts of vomit next to the driver's side door, about 18-30 inches away. *Id.* at 117-18, 126. Officer Wittmer approached the driver's side and saw a small marijuana roach near the vomit. *Id.* at 122. A marijuana roach is a hollowed out cigar wrapper which is sometimes re-wrapped with marijuana and the roach is the end of that after it's smoked. *Id.* at 122-23.

The [o]fficer saw [Appellant] sitting in the car with his head bent forward, all the windows rolled up, and the car locked. *Id.* at 123. The [o]fficer shined his light into [Appellant's] face, but [Appellant] didn't react. *Id.* While walking around the vehicle, the [o]fficer noticed a Rolling Rock beer in a half rolled down brown paper bag inside the center console of the truck. *Id.* Officer Wittmer could see the label and felt the brown paper bag indicated that the bottle came from Tony's Pizza Shop. *Id.* at 126. Officer Wittmer said [Appellant] was sitting upright in the seat and appeared to be under the influence of alcohol, and was incoherent. *Id.* Officer Wittmer testified that the car had a rear bench seat and the front seats could recline. *Id.* at 125. The [o]fficer testified that the car was still running, keys in the ignition, and the headlights were on. *Id.* Officer [James] Ficzko arrived on scene with Officer Wittmer, and was present when he approached the vehicle. *Id.* at 126. Officer Wittmer pounded on the window to wake [Appellant] as the vehicle was locked, and it took multiple

attempts to wake him up. *Id.* at 127. When the [o]fficers were finally able to rouse [Appellant], he appeared to be unaware of who was outside the car, just stared, and took around 15 seconds to realize the police were knocking on his window. *Id.* at 127-28. When [Appellant] opened the door, the [o]fficer was "immediately hit with a strong odor of freshly smoked marijuana coming straight from the vehicle." *Id.* at 128. The [o]fficer said fresh marijuana has a "more botanical" smell and freshly smoked marijuana smells burnt. *Id.* The smell of freshly burnt marijuana signified to the [o]fficer that marijuana was recently smoked inside the vehicle. *Id.* When Officer Wittmer began to speak to [Appellant], he noted a smell of alcohol on [Appellant's] breath. *Id.* at 129. [Appellant] needed to hold onto the vehicle when he exited, and the [o]fficer never saw a cane in the car and [Appellant] never indicated he had balance or medical issues. *Id.* At no point in the encounter did [Appellant] use a cane or indicate that he needed assistance or a wheelchair. *Id.* In the parking lot, [Appellant] was having trouble with his balance, and needed to hold onto the car the whole time. *Id.* at 130-31.

[Appellant's] eyes were glassy, his speech was slurred, and when asked if he had consumed alcohol that evening [Appellant] said he had. *Id.* at 131-32. [Appellant] denied marijuana use. *Id.* at 132. Officer Wittmer asked [Appellant] to perform a field sobriety test. *Id.* at 133. [Appellant] never indicated that he was physically unable to perform the tests, or that he had medical conditions [that] would affect his ability to perform the tests. *Id.* at 134. The field sobriety tests were done in the parking lot, on the large flat open black top area. *Id.* at 134-35. The first field sobriety test conducted was the nine step walk and turn test which the [o]fficer explained and demonstrated to [Appellant]. *Id.* at 136-38. [Appellant] was unable to keep his balance during the instructional phase, he did not step heel to toe as required, and [Appellant] only took 9 steps and failed to turn and do the final 9 steps. *Id.* at 138-39. [Appellant] also failed to stay on the line. *Id.* at 138-39. The [o]fficer believed this was indicative of signs of impairment. *Id.* at 139. [Appellant] was next told to do a one-leg stand test[,] which Officer Wittmer explained and demonstrated for [Appellant]. *Id.* at 139-40. The test is supposed to last for 30 seconds, but [Appellant] put his foot down after 5 seconds and[,] besides failing to complete the test, [Appellant] was swaying and unbalanced. *Id.* at 141. The [o]fficer then asked [Appellant] for a portable breath test, but [Appellant] refused to blow into the test as demonstrated. *Id.* at

142. He continued to turn his head away, and would not speak. *Id.* [Appellant] was given multiple opportunities to take the test. *Id.* [Appellant] was placed into custody, and the [o]fficer went to retrieve the marijuana roach but the bottom was soaked in vomit, so the [o]fficer dropped it and destroyed it. *Id.* at 144. The destruction of the marijuana roach was consistent with department policy when evidence is contaminated. *Id.* The Rolling Rock beer bottle was half consumed, and the [o]fficer poured out the rest and destroyed it on scene consistent with department policy because there is no safe way to transport an open container of alcohol. *Id.* at 144. No photographs of the evidence were taken because the [o]fficer did not have a camera. *Id.* The dash cam was not activated during the encounter, and the recording from the transport to the hospital showed nothing as [Appellant] did not speak or do anything. *Id.* at 147-48.

At the hospital, the [o]fficer provided a form requesting [Appellant] submit to a chemical test, and informing [Appellant] that the refusal to submit to the chemical test will result in a 12 month suspension of operating privileges. *Id.* at 150. The form also stated that [Appellant] had no right to speak to an attorney or anyone else before deciding whether to submit to the test and a request to speak to anyone or remaining silen[t] would be deemed a refusal. *Id.* [Appellant] ignored the [o]fficer who continued to explain the test. *Id.* at 151. [Appellant] didn't submit to a blood test after being read the warnings, and the [o]fficer deemed it a refusal. *Id.* at 152. [Appellant] was brought home to his wife, around an hour after the [o]fficer first encountered [Appellant]. *Id.* Based on his training and experience, Officer Wittmer believed [Appellant] was incapable of safe driving. *Id.*

On cross, Officer Wittmer testified that it is possible to edit the reports he generates, but that he was out of work for 10 months following a serious car accident. Therefore, he could have updated his report in the Fall of 2017 when he returned, but not before. *Id.* at 161-63. Nowhere in the [o]fficer's report or affidavit is there a mention of the headlights being on or that [Appellant] was sitting upright. *Id.* at 165-66. The report also didn't say every word was slurred, the [o]fficer just wrote[,] "he slurred his words," and it doesn't say the marijuana smel[led] freshly burnt, just that the marijuana smel[led] burnt. *Id.* The report also doesn't mention the [o]fficer['s] asking [Appellant] if he had any physical conditions that would impair his ability to perform the tests. *Id.* at 166-67. The [o]fficer stated that his

- 4 -

training indicates to check for medical conditions, but that he does not indicate his instructional phase in his report. *Id.* at 167. The [o]fficer also indicated that the bottle of beer could have come from anywhere. *Id.* at 176. The [d]efense asked if the [o]fficer could have taken pictures with his cell phone, but he said that is not policy as the cell phone itself would become evidence. *Id.* at 178-79. The [o]fficer said he was one hundred percent certain [Appellant's] headlights were on, his seat was in the upright position, and [Appellant] was passed out. *Id.* at 179. The [o]fficer also stated the even without the field sobriety tests, he felt there was enough evidence to feel [Appellant] was incapable of safe driving based on his training and experience. *Id.* at 181.

Officer Ficzko then testified to being employed with the Abington Police Department for almost 8 years. *Id.* at 188. Officer Ficzko had standard field sobriety testing training as well as [Advanced Roadside Impairment] training…. *Id.* at 189. Officer Ficzko is also familiar with the effects of drugs and alcohol. *Id.* at 190. Officer Ficzko responded as back up to Officer Wittmer, and saw [Appellant] in the driver's seat, with the keys in the ignition and engine running. *Id.* at 191-92. Officer Ficzko also saw an open container in the center console. *Id.* at 192. Officer Ficzko also observed that [Appellant's] speech was slurred, there was an odor of alcohol from [Appellant], and a burnt marijuana smell coming from the vehicle and clothing. *Id.* at 192-93. Officer Ficzko said the smell indicated to him recent use of marijuana in the vehicle. *Id.* at 193. The [o]fficer also noted a puddle of vomit and remnants of a burnt marijuana cigarette outside the car. *Id.* Based on his training and experience, Officer Ficzko believed that [Appellant] was unable to safely operate a motor vehicle at that time based on his observations of [Appellant]. *Id.* at 193-94.

The Defense called Mary Nichelson to testify. She had been married to [Appellant] for 40 years. *Id.* at 199. Mrs. Nichelson testified that her husband has a broken ankle, knee problems, and back problems. *Id.* at 200. The back problems stemmed from 2006 when he had a fractured pelvis and knee issues from an accident. *Id.* at 200-01. She testified that [Appellant] uses a cane from "time to time." *Id.* at 201. Mrs. Nichelson also testified that without a cane the [Appellant] has balance problems. *Id.* She testified that [Appellant] has Post Traumatic Stress Disorder, and when [Appellant] gets mad he starts to scream and then leaves. *Id.* at 201-02. He will often sit in his truck and listen to music. *Id.* at 203. The truck will be running, but the lights will be off. *Id.* She testified that when he is angry he sometimes

won't talk or follow commands. *Id.* at 204. Mrs. Nichelson also testified that her husband is a deep sleeper and hard to wake. *Id.* Mrs. Nichelson testified that she was at her cousin's house on the night before the arrest, and [Appellant] was there from 5:30-8:30 PM. *Id.* at 207. She didn't see [Appellant] again until the police brought him home. *Id.* at 207-08. She said when he was brought home she didn't think he smelled of marijuana and she didn't think he was under the influence. *Id.* at 208. When Mrs. Nichelson went to recover the vehicle she didn't see vomit, and she didn't think the car smelled of marijuana. *Id.* at 210. However, it was important for her husband to keep his commercial driver's license because that is what he does for a living. *Id.* at 211-12.

[Appellant] testified that he is an over-the-road trucker, and works long hours. N.T. Trial[,] 2/28/17[,] [at] 8. He often sleeps in his truck while it's running. *Id.* [Appellant] testified to mental health issues[,] which lead him to want to be alone, so he goes to his truck to sleep or rest. *Id.* at 11. If people engage with him, [Appellant] said he gets angry. *Id.* [Appellant] also said he was under a doctor's care for a "bad ankle, bad knee, and a bad back." *Id.* On the day before he was arrested, [Appellant] had been in Illinois and drove to his cousin's house. *Id.* at 13. [Appellant] denied drinking. *Id.* After his cousin's house, he went to The Elbow Lounge Bar and claimed he only drank tonic and lime until the end of the night where he had "one glass of beer" which [Appellant] said he didn't finish. *Id.* at 14. [Appellant] said he got agitated so he parked in the back to take a nap, and claimed he reclined his seat. *Id.* at 15-16. [Appellant] denied buying a bottle of beer or one being in his truck. *Id.* at 17. [Appellant] claimed that when the police woke him up he wasn't all there because he had been in a deep sleep. *Id.* at 18. [Appellant] also claimed that when asked to do field sobriety tests, he told the officer about his bad ankle, knees, and back. *Id.* at 19. He claim[ed that] despite this, the police had him perform field sobriety tests, that he had a cane in his truck, and the police didn't let him retrieve it. *Id.* at 19. [Appellant] also denied seeing vomit outside his car or smoking marijuana. *Id.* at 20. [Appellant] claimed he didn't do anything the [o]fficer asked because "I just felt that he was going to stick me with a DUI no matter what I said or did." *Id.* He said he didn't give a blood test because he didn't think he did anything wrong and just "shutdown." *Id.* at 21. On cross, [Appellant] denied being offered a portable breath test, and agreed that his physical issues didn't prevent him from giving a blood sample. *Id.* at 23-24.

On February 28, 2017, a jury found [Appellant] guilty of DUI-general impairment and not guilty of DUI-impaired ability. This [c]ourt found [Appellant] guilty of the summary [open containers] charge. On the same day, [Appellant] was sentenced to five days to six months of incarceration for the DUI charge and given a $25 fine for the summary offense. On March 24, 2017, [Appellant] filed a timely notice of appeal.

Trial Court Opinion (TCO), 5/22/17, at 1-8 (footnote omitted).

The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and Appellant timely complied. Herein, he presents three questions for our review:

1. Whether the trial court erred in denying Appellant's request for individual *voir dire*[?]

2. Whether the trial court erred in allowing evidence of the refusal[?]

3. Whether the evidence was insufficient as a matter of law for a DUI conviction and for the summary charge of open containers conviction[?]

Appellant's Brief at 7.

In Appellant's first issue, he challenges the trial court's refusal to individually *voir dire* prospective jurors about their responses to a certain question (hereinafter, "Question 15") asked by the court when it examined the jury pool collectively. Specifically, the court questioned the prospective jurors all together, as follows:

[The Court]: Is there anyone here who himself or herself has been a victim of a crime or who has had a family member who has been a victim of a crime? Raise your card if that applies to you. And I'll have a backup question to this one. [The numbers of the prospective jurors who are raising cards are] 3, 12, 13, 23, 24, 25. [Number] 16, I have you. 27, 19, 10, 20, 39, 38, 47 and 44. All right.

Of all those that raised their card, and there were many on that question about being a victim or has had a family member [who has been] a victim of a crime, this case obviously deals with two counts of DUI, so you know generally what this case is about.

If that question about being a victim or a family member being a victim of a crime, if you believe that given the very limited facts of this case would impair your ability to be fair and impartial, I need you to be honest with me, then re-raise your card of those who raised their card before. All right. I see no one who has re-raised their card.

N.T. Trial, 2/27/17, at 15-16.

After this collective questioning of the jury pool, defense counsel requested individual *voir dire* regarding some of the questions, including Question 15. The court denied that request regarding Question 15, but it did grant defense counsel's request pertaining to other questions, including Question 8. That question asked the jurors if they "would either accept or reject the testimony of a police officer merely because that witness happens to be a police officer[.]" ***Id.*** at 14. None of the jury panel raised their hands to Question 8. ***Id.*** However, 15 of them had answered "yes" to that same question on a confidential juror information questionnaire filled out prior to *voir dire*. ***See id.*** at 24. Based on this inconsistency, the court granted defense counsel's request to individually *voir dire* the 15 prospective jurors who had answered "yes" to Question 8 on the written questionnaire. Through those examinations, several of the jurors were stricken for cause after they made statements indicating they may be biased in favor of police officers.

Appellant now contends that, because some of the prospective jurors did not honestly answer Question 8 during the trial court's collective *voir dire*,

it demonstrates that the prospective jurors were likely also dishonest in answering Question 15, and the court should have individually examined the jurors on that question. He further maintains that the jury panel's hesitation to answer truthfully during the collective *voir dire* was because

> the trial court made comments before the entire panel that expressly indicated it would be bad if any of them indicated they could not be fair. (N.T. [Trial, 2/27/17, at] 24). Thus, no one raised their hand when the trial court asked if, in light of their responses to questions #8 … and #15, it would affect their ability to be fair and impartial. The words of the trial court had a severe chilling effect on the jurors['] comfort level in freely expressing and communicating their beliefs. Thus, many who responded in a biased manner on their questionnaires in the comfort of their homes, failed to respond after the trial court commented it would be bad to express their bias when asked the same questions in the courtroom. The trial court['s] comment caused them to become timid, and they did not raise their hands. Thus[,] defense counsel observed their uneasiness first hand, and surmised there was a strong likelihood that the jurors were not being truthful or that they were uncomfortable discussing their true feelings in open court.

Appellant's Brief at 15-16.

Notably, at no point does Appellant explicitly state what improper comment the trial court made that allegedly caused 'uneasiness' in the prospective jurors' minds and compelled them not to answer honestly, despite being under oath during the collective examination. The only portion of the record cited by Appellant in support of this argument is a discussion between the trial court and the parties, outside the hearing of the jury. *See id.* at 15 (citing N.T. Trial, 2/27/17, at 24). Because Appellant does not identify where in the record the court allegedly made an improper comment, or even state

in his appellate brief what that comment was, he has waived his argument that this ostensible tainting of the jury pool required individual *voir dire* on Question 15.

We also disagree with Appellant that the individual *voir dire* of prospective jurors on Question 8 demonstrates that the court should have also conducted individual examinations regarding Question 15. There was a clear inconsistency between the prospective jurors' answers of Question 8 on the written questionnaire and their responses during the collective *voir dire*. The same is not true for Question 15; multiple prospective jurors raised their cards during the collective *voir dire* indicating that they, or a family member, had been the victim of a crime. Appellant does not claim that those answers were inconsistent with the written questionnaires. Additionally, unlike with Question 8, the court followed the collective *voir dire* on Question 15 with a second question about whether those prospective jurors believed that they would not be able to be fair and impartial based on their, or their family member's, victimization. ***See*** N.T. Trial, 2/27/17, at 15. The court specifically directed the jury pool "to be honest with [the court]" and to raise their card if they questioned their ability to be impartial and fair on this basis. ***Id.*** at 16. No prospective juror raised a card. Therefore, unlike with Question 8, there was no facial inconsistency or 'red flags' in the prospective jurors' responses during the collective *voir dire* on Question 15. Consequently, Appellant has not demonstrated that the trial court abused its discretion by not conducting

an individual examination of the jury pool regarding that question.[1] **See Commonwealth v. Howard**, 375 A.2d 79, 82 (Pa. Super. 1977) (stating that, in all non-capital cases, the decision to permit defense counsel to conduct individual *voir dire* of prospective jurors "is a matter resting within the sound discretion of the trial judge") (citation omitted).

Appellant next contends that the trial court erred by allowing the Commonwealth to admit evidence, as proof of his consciousness of guilt, that he refused to submit to a breathalyzer test and a warrantless blood draw. First, Appellant argues that his refusal of the breath test should not have been admitted because he contested that he was even asked to submit to such a test. Second, regarding his refusal of a warrantless blood test, Appellant maintains that this evidence was inadmissible under **Birchfield v. North Dakota**, 136 S.Ct. 2160 (2016), where the United States Supreme Court held

---

[1] We also stress that Appellant at no point clarifies whether any of the 15 prospective jurors who indicated, during the collective examination, that they or a family member had been the victim of a crime, were actually chosen to be part of the final jury. The trial court points out that "the jury [was] selected from jurors 1-32 and the alternates would be chosen from 33-36[,]" meaning that 4 of the 15 who answered "yes" to Question 15 during the collective *voir dire* did not end up on the jury panel (*i.e.*, jurors number 38, 39, 44, and 47). TCO at 10. Additionally, the record indicates that jurors 3, 12, 13, 23 were stricken for cause for other reasons. **See** N.T. Trial, 2/27/17, at 40, 48, 51, 65. Appellant does not specify who, if any, of the remaining 7 jurors that indicated that they, or a family member, had been the victim of a crime were ultimately empaneled. Therefore, we would alternatively conclude that he has not established that he was tried by a biased jury and, thus, reversal is not required in this case. **See Commonwealth v. Hoffman**, 398 A.2d 658, 660 (Pa. Super. 1979) ("The purpose of examining jurors under *voir dire* is to secure a competent, fair, impartial and unprejudiced jury.").

"that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Id.* at 2186. According to Appellant, the introduction of the evidence that he refused the blood draw constituted a 'criminal penalty' of the type prohibited by the holding of **Birchfield**. Appellant also complains that the trial court should not have issued a consciousness-of-guilt jury instruction regarding his refusal of both the breath and blood tests.

Initially, we conclude that Appellant has waived these challenges for our review. Prior to trial, the Commonwealth filed a motion *in limine* seeking to introduce the evidence that Appellant had refused to submit to the blood test. Appellant did not file a responsive motion. Additionally, he does not point to - and we cannot locate - where in the record he lodged any objection to the admission of this evidence, or to the admission of the evidence that he refused to submit to a breathalyzer. **See , e.g.**, N.T. Trial, 2/27/17, at 149-52 (Officer Wittmer's testifying, without objection by Appellant, that he read Appellant the DL-26 chemical test warnings, after which Appellant refused to submit to a blood test); **Id.** at 142 (Officer Wittmer's testifying, without objection by Appellant, that Appellant refused to take a breathalyzer test). Likewise, Appellant does not cite to where he objected to the trial court's issuance of the consciousness-of-guilt jury instruction, and we see no such objection before, during, or after the jury charge was given. **See** N.T. Trial, 2/28/17, at 67 (the court's instructing the jury on consciousness of guilt regarding Appellant's refusal of the breath and blood tests without objection by

- 12 -

Appellant). Because Appellant does not point to where he preserved these evidentiary and jury instruction challenges at trial, we deem them waived for our review. *Commonwealth v. Boyd*, 679 A.2d 1284, 1289 (Pa. Super. 1996) ("In order to preserve for appellate review any claim of error regarding the admission of evidence, a party must specifically object to the admission of such evidence at trial. Failure to do so results in a waiver of that claim of error in the evidence's admission.") (citation omitted); Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as errors, unless specific objections are made hereto before the jury retires to deliberate. All such objections shall be made beyond the hearing of the jury.").

Notwithstanding Appellant's waiver of these claims, we would deem them meritless. First, in regard to the admission of Appellant's refusal of the blood test, we rely on this Court's recent decision in *Commonwealth v. Bell*, 67 A.3d 744 (Pa. Super. 2017), *appeal granted*, 183 A.3d 978 (Pa. 2018) (holding that evidence that Bell refused a blood test was admissible under *Birchfield* as an evidentiary consequence of his decision to refuse to submit to that test).[2] Appellant does not even acknowledge *Bell*, let alone make any attempt to distinguish our holding in that case from his argument herein.

_____

[2] We recognize that our decision in *Bell* is currently under review by our Supreme Court. However, until the Court issues a ruling on *Bell*, it remains binding precedent on this Court. *See Marks v. Nationwide Ins. Co.*, 762 A.2d 1098, 1101 (Pa. Super. 2000) (citing *Sorber v. American Motorists Ins. Co.*, 680 A.2d 881, 882 (Pa. Super. 1996)).

Consequently, we would conclude that the court did not abuse its discretion in admitting the evidence that he refused the warrantless blood draw. **See Commonwealth v. Young**, 989 A.2d 920, 924 (Pa. Super. 2010) (recognizing that questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion) (citation omitted).

We would also discern no abuse of discretion in the court's decision to admit the evidence that Appellant refused the breathalyzer test. Officer Wittmer testified that he asked Appellant "to perform [the test] multiple times" but "[h]e continued to refuse by turning his head away from [the [o]fficer] and just not speaking to [the officer] at all." N.T. Trial, 2/27/17, at 142. Simply because Appellant contested the fact that the officer asked him to take a breathalyzer test did not render inadmissible the officer's testimony that Appellant refused the test. Additionally, because we would conclude that the court did not err in admitting the evidence that Appellant refused both the breath and blood tests, we would also reject his challenge to the court's consciousness-of-guilt instruction regarding those refusals.

In his third and final issue, Appellant claims that the evidence was insufficient to sustain his DUI and open containers convictions.

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. **Commonwealth v. Moreno**, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact

- 14 -

finder. ***Commonwealth v. Hartzell***, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. ***Moreno, supra*** at 136.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011).

Here, Appellant was convicted of DUI under 75 Pa.C.S. § 3802(a)(1), which reads:

> **(a) General impairment.--**
>
> (1) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.

Appellant first avers that the Commonwealth failed to prove that he operated, or was in actual physical control of the movement of his vehicle, where the officers found him "in such a deep sleep that shining a light on his face provoked no reaction." Appellant's Brief at 43. In rejecting this sufficiency argument, the trial court reasoned that Appellant's own testimony demonstrated that he drove the car while intoxicated, as Appellant stated: "I left the bar so I don't [*sic*] get myself in trouble; got in my truck; **went around and parked in the back** and just said I would take a nap because I was tired anyway." N.T. Trial, 2/28/17, at 16 (emphasis added); ***see also*** TCO at 17-18. We agree with the trial court. Appellant's testimony, along with the evidence of his intoxication - *i.e.*, the smell of alcohol on his breath and burnt marijuana in his car, the vomit and marijuana "roach" found outside the door to his vehicle, his failing the field sobriety tests, and his refusal to

submit to a breath or blood test - were sufficient to prove that Appellant operated his vehicle while intoxicated to a point that he could not safely do so.[3]

Appellant also argues that his DUI conviction cannot stand because he was not driving his vehicle on a highway or trafficway. As this Court has recognized, DUI

> is defined in the vehicle code as a 'Serious Traffic Offense.' A Serious Traffic Offense, according to 75 Pa.C.S.[] § 3101, must be committed on a highway or trafficway. A highway is defined as[,]
>
>> the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel. The term includes a roadway open to the use of the public for vehicular travel on grounds of a college or university or public or private school or public or historical park.
>
> 75 Pa.C.S.[] § 102.

_____

[3] Moreover, we reject Appellant's contention that the trial court erroneously instructed the jury that it could convict Appellant of DUI if it found that he posed a 'threat' of driving. Appellant's Brief at 46. In the portion of the charge cited by Appellant, the court stated: "These terms are broader than the term drive because the law is concerned with **the threat to public safety** for motorists who have a present intention of driving a vehicle immediately within their control, as well as those who actually do drive while they are under the influence." N.T. Trial, 2/28/17, at 65 (emphasis added). Initially, at no point did Appellant object to this portion of the jury charge, and he cites no legal authority to support his claim that he did "not have to object to a patently false instruction…." Appellant's Brief at 46. Consequently, we deem this claim waived. **See** Pa.R.Crim.P. 647(C). In any event, it is apparent that the court used the word "threat" not to refer to the chance that Appellant might drive his vehicle, but in regard to the public safety concerns on which the DUI statute is premised. Accordingly, we would deem Appellant's challenge to this instruction meritless, even if preserved.

A trafficway is defined as[,]

> the entire width between property lines or other boundary lines of every way or place of which any part is open to the public for purposes of vehicular travel as a matter of right or custom.

75 Pa.C.S.[] § 102.

*Commonwealth v. Wilson*, 553 A.2d 452, 453 (Pa. Super. 1989).

Here, Appellant avers that he "was in a private parking lot, not on a highway. Moreover, the vehicle was not on a traffic way [*sic*] and was in fact on private property." Appellant's Brief at 4. Appellant maintains that, "[t]he case law on whether a private parking lot constitutes a public parking space is far from settled." *Id.* In support, he cites *Commonwealth v. Owen*, 580 A.2d 412 (Pa. Super. 1990), and *Commonwealth v. McFadden*, 547 A.2d 774 (Pa. Super. 1988).

In *Owen*, we held that the defendant's being stopped "in the Nittany Silver Parking Lot in University Park, Centre County, Pennsylvania[,]" did not support his DUI conviction, where the Commonwealth "presented … *no* competent evidence concerning the nature of the parking lot where [Owen] was stopped by police." *Owen*, 580 A.2d at 413, 414 (emphasis in original). Specifically, there was no evidence demonstrating, or stipulation by the parties conceding, that "the parking lot was open to the public…." *Id.* at 415.

In *McFadden* (which we note was a plurality decision and, thus, is not binding precedent, *see Wilson*, 553 A.2d at 454), we reversed McFadden's DUI conviction where he was accused of driving while intoxicated on a private drive in a trailer court. *McFadden*, 547 A.2d at 775. Because "the

- 17 -

Commonwealth failed to adduce any evidence upon which the jury could have based a conclusion that the road was customarily open to vehicular traffic[,]" aside from residents and guests of the trailer court, we held that McFadden did not drive on a highway or trafficway as required by the DUI statute. *Id.* at 776.

The present case is clearly distinguishable from *Owen* and *McFadden*. Here, the Commonwealth presented evidence that the parking lot in which Appellant's vehicle was driven was owned by The Elbow Room and Tony's Pizza, both of which are businesses that are open to the public. *See* N.T. Trial, 2/27/17, at 115-16. Public patrons of those businesses, such as Appellant, regularly use that parking lot. *Id.* at 116. We agree with the trial court that "[t]he parking lot here is similar to [a] parking lot of a mall that is open to the public for shopping." TCO at 18. This Court has held that such a public parking lot is a 'trafficway' for purposes of the DUI statute. *See Commonwealth v. Proctor*, 625 A.2d 1221, 1224 (Pa. Super. 1993) (holding that because "the evidence established that [the] appellant drove in a parking lot of a mall that is open to the public for shopping[,] … there was sufficient evidence for the jury to conclude that the parking area was a trafficway"). *See also Wilson*, 553 A.2d at 453-54 (concluding that the parking lot of an Elks Club is open to the public and, therefore, is a trafficway for purposes of the DUI statute). Accordingly, Appellant's challenge to the sufficiency of the evidence to support his DUI conviction is meritless.

Regarding the sufficiency of the evidence to support his open containers conviction, Appellant has waived this claim for our review. Other than setting forth the statute defining that offense, Appellant's entire argument regarding why the evidence was insufficient to prove the open containers charge amounts to the following sentence: "Appellant, asleep in his pick-up truck in a parking lot[,] does not meet the definition of a highway." Appellant's Brief at 50. Appellant's underdeveloped and legally unsupported argument is insufficient to permit this Court to meaningfully review his claim.[4] Therefore, Appellant's challenge to this conviction is waived. *See Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("When briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review. … [W]hen defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.").

Judgment of sentence affirmed.

_____

[4] It is particularly troubling that Appellant offers no counter to the trial court's determination that the evidence was sufficient because,

> [Appellant] testified that he did not buy the beer bottle at Tony's Pizza. [*See* N.T. Trial, 2/28/17, at 17.] Therefore, the only way for the beer bottle to be inside [Appellant's] truck was if he bought it before driving to the Elbow Lounge/Tony's Pizza parking lot. [Appellant's] own testimony circumstantially establishes that [Appellant] drove with the open container of beer on a highway to the parking lot….

TCO at 19.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/16/18